IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF WYOMING

———————————————

| | |
|---|---|
| ALEXIS R. RIZAS, Individually and as the Personal Representative of the Wrongful Death Beneficiaries of JOHN J. RIZAS, deceased; JOHN FRIEL, Individually and as the Personal Representative of the Wrongful Death Beneficiaries of ELIZABETH A. RIZAS, Deceased; RONALD J. MICIOTTO, as the Personal Representative of the Wrongful Death Beneficiaries of LINDA AND LEWIS CLARK, Deceased; JAMES CLARK; LAWRENCE WILSON; and JOYCE WILSON, | Case No. 08-CV-139-J |
| Plaintiffs, | |
| vs. | |
| VAIL RESORTS, INC.; GRAND TETON LODGE COMPANY; TAUCK, INC., a.k.a. TAUCK WORLD DISCOVERY, INC., a.k.a. TAUCK TOURS, INC., | |
| Defendants. | |

_____

**ORDER ON DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT**

_____

This matter comes before the Court on Defendants' motions for summary judgment.

Tauck, Inc. filed five motions and Grand Teton Lodge Company ("GTLC") filed one, all on

July 22, 2009. After careful consideration of the arguments and evidence supplied by both

Plaintiffs and Defendants, for the reasons discussed in detail below, the Court finds that a

genuine issue of material fact exists regarding the inherent risk of the river float activity. In

all other respects, the Court will grant the defendants' motions for summary judgment.

### FACTS

The Court relates the following facts in the light most favorable to Plaintiffs, who are

opposing Defendants' motions for summary judgment.

Tauck is a corporation formed under the laws of New Jersey and primarily doing

business in Connecticut. Stipulated Facts, Docket Entry 108, ¶ 9. Tauck is in the business

of selling tour packages to its clients, one of which in 2006 was a tour called the

"Yellowstone & Grand Teton - North." *Id.* ¶ 24. This tour began in Salt Lake City, Utah and

ended in Rapid City, South Dakota. *Id.* The tour included a two-night stay at the Jackson

Lake Lodge in the Grand Teton National Park, and the Lodge was operated by GTLC. *Id.*

¶¶ 23, 24. GTLC is organized under the laws of Wyoming and operates within the Grand

Teton National Park pursuant to a concessionaire agreement with the National Park Service.

*Id.* ¶¶ 7, 8. Among the services that GTLC offered its guests is a 10-mile float trip along the

Snake River from Deadman's Bar to the Moose Landing. *Id.* ¶¶ 23, 24. Tauck's 2006

promotional materials contains the following sentence: "Take a scenic ten-mile raft trip on the Snake River as it meanders through spectacular mountain scenery alive with wildlife, including moose, elk, deer, and many species of birds." *Plaintiff's Resp. to Motion for Summary Judgment on Plaintiffs' Claim for Fraud*, Ex. 5.

On June 2, 2006, a tour group gathered at the Lodge at approximately 8:00 a.m. Stipulated Facts ¶ 27. They traveled via several vans to the rafting launch site at Deadman's Bar. *Id.* The trip took approximately one hour. There the larger group was split into four smaller groups, one for each raft provided. *Id.* ¶ 28. Raft No. 1 was guided by Wayne Johnson, an employee of GTLC. The raft at issue, Raft No. 2, had 11 passengers: John Rizas, Elizabeth Rizas, Patricia Rizas, Linda Clark, James Clark, Lawrence "Bubba" Wilson, Joyce Wilson, Tom Rizas, Ruth Rizas, Jon Shaw, and Maria Urrutia. *Id.* ¶ 29. The raft guide was Daniel Hobbs, who was also a GTLC employee and had been for four years. *Id.* ¶ 30.

During the float trip, Raft No. 2 struck a log jam. *Id.* ¶ 32. The collision occurred in the Funnelcake channel, which was one of several braided channels of the river. The raft upended as a result and all passengers were thrown into the river. John Rizas, Elizabeth Rizas, and Linda Clark died as a result. Further facts will be discussed as necessary to resolve each legal issue.

### DISCUSSION

This Court has jurisdiction pursuant to 28 U.S.C. § 1332 because there is complete diversity of citizenship between the plaintiffs and defendants. Vail Resorts was dismissed from this case for lack of jurisdiction on June 16, 2009. Plaintiffs are citizens of Maryland, Arizona, Louisiana, and Georgia. GTLC is incorporated in Wyoming, which is also its principal place of business. Tauk is incorporated in New Jersey, and its principal place of business is Connecticut.

Summary judgment is appropriate "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); *e.g.*, *Kerber v. Qwest Pension Plan*, 572 F.3d 1135, 1144 (10th Cir. 2009). The Court must view all facts and make inferences from the evidence in the light most favorable to the non-moving party. *E.g.*, *Utah Animal Rights Coalition v. Salt Lake County*, 566 F.3d 1236, 1242 (10th Cir. 2009). The Court may consider only admissible evidence. *Wright-Simmons v. City of Oklahoma City*, 155 F.3d 1264, 1268 (10th Cir. 1998). See also Fed. R. Civ. P. 56(e)(1).

## Choice of Law

Because the Court is sitting in diversity, it would normally apply Wyoming law. See *Butt v. Bank of America, N.A.*, 477 F.3d 1171, 1179 (10th Cir. 2007). In this case, however, Plaintiffs have raised a choice-of-law issue by urging this Court to apply Connecticut law.

A federal court sitting in diversity applies the choice-of-law principles of the state in which it sits. *Morrison Knudson Corp. v. Ground Improvement Techniques, Inc.*, 532 F.3d 1063, 1077 n.12 (10th Cir. 2008). Accordingly, this Court will apply Wyoming choice-of-law principles.

Plaintiffs first contend that Connecticut law applies because Tauck and its clients signed a contract to that effect. Specifically, the contract states the following:

> It is agreed by Tauck World Discovery and the Tour Member that all legal claims, actions and proceedings against Tauck World Discovery under, in connection with, resulting from or incident to a tour may be instituted, if at all, only in a state or federal court within the State of Connecticut, USA, to the exclusion of the courts of or in any other state or jurisdiction. It is further agreed that all such claims, actions and proceedings shall be governed by and decided in accordance with the laws of the State of Connecticut.

*Plaintiffs' Resp. to Motion for Summary Judgment on Plaintiffs' Claims for Fraud*, Ex. 2. Tauck counters by claiming that the choice-of-law provision was intended for its benefit, and therefore it can waive that provision. Furthermore, it points out that, if the contract is to be enforced, there are a number of other provisions that would benefit Tauck, such as the choice-of-forum provision in the excerpt above.

In Wyoming, a contract must be construed according to the law of the place where it was made. *J.W. Denio Milling Co. v. Malin*, 165 P. 1113, 1116 (Wyo. 1917). There is no

evidence indicating where the contract at issue was formed, but that makes little difference because the law of waiver of contract provisions is widespread and well accepted. "A party to a contract may waive a provision of the contract that was included for his benefit." *E.g.*, *Lanna v. Greene*, 399, A.2d 837, 841 (Conn. 1978). See *Takahashi v. Pepper Tank & Contracting Co.*, 131 P.2d 339, 354 (Wyo. 1942). The question in this case is whether the choice-of-law provision was included for Tauck's benefit.

The Court finds that it was. As far as the evidence indicates, none of the tour members or their survivors who are involved in this action are residents of Connecticut. The three plaintiffs who were also tour members, Mr. Clark and the Wilsons, are residents of Louisiana and Georgia, respectively. The residence of the three deceased tour members is not clear from the evidence submitted to the Court. Even if one of the three decedents were residents of Connecticut, that does not necessarily mean that the provision existed for that person's benefit. Tauck drafted the provision at issue. The provision benefits Tauck by ensuring that any claims will be litigated in the forum most convenient to it, and under the law with which it is most familiar. Meanwhile, there is little or no benefit to any tour member who is not a resident of Connecticut. Even then, the choice-of-law provision would benefit the tour member by happenstance rather than by intention. Accordingly, Tauck may waive the choice of law provision, and has affirmatively stated that it has done so. Its waiver

is further supported by the fact that it has never contended that suit is improper in this Court as a result of the choice-of-forum provision in the same contract.

Even if Tauck had not waived its right to enforce the choice-of-law provision, this Court would not enforce this provision due to Wyoming's strong public policy of recreational immunity. Plaintiffs seek application of Connecticut law largely to avoid the effects of Wyoming's Recreational Safety Act, Wyo. Stat. Ann. §§ 1-1-121 through -123 (LexisNexis 2009). The Court will discuss the Act in detail below; it is sufficient here to note that the Act provides a near-total elimination liability of a recreation provider where a person is injured because of an "inherent risk" of a recreational activity. River floating is specifically named as a qualifying recreational activity. Wyo. Stat. Ann. § 1-1-122(a)(iii). Consequently, Plaintiffs seek application of Connecticut law because Connecticut is not so protective of its recreational providers as Wyoming.

It is this very policy of protecting these providers that renders the contractual choice-of-law provision invalid. The Wyoming Supreme Court has not answered the question of whether the Act represents so strong a Wyoming policy as to render invalid a contractual choice-of-law provision that would eliminate the Act's application. This Court believes that Wyoming, like other states, would look to general contract principles to resolve this question. The Restatement (Second) of Conflict of Laws § 187 (1971) states:

(1)     The law of the state chosen by the parties to govern their contractual rights and duties will be applied if the particular issue is one which the parties could have resolved by an explicit provision in their agreement directed to that issue.

(2)     The law of the state chosen by the parties to govern their contractual rights and duties will be applied, even if the particular issue is one which the parties could not have resolved by an explicit provision in their agreement directed to that issue, unless either

(a)     the chosen state has no substantial relationship to the parties or the transaction and there is no other reasonable basis for the parties choice, or

(b)     application of the law of the chosen state would be contrary to a fundamental policy of a state which has a materially greater interest than the chosen state in the determination of the particular issue and which, under the rule of § 188, would be the state of the applicable law in the absence of an effective choice of law by the parties.

(3)     In the absence of a contrary indication of intention, the reference is to the local law of the state of the chosen law.

The tour members and Tauck agreed that Connecticut law would apply, and Connecticut has a significant connection to the contract because of Tauck's operation there. Nevertheless, Wyoming's interest in the resolution of this issue is significantly greater because important Wyoming policy concerns are involved in the question of whether a

provider of recreation opportunities should be subject to liability for injury from inherent risks. Absent a Connecticut plaintiff, Connecticut has no interest in whether a Wyoming corporation is held liable. Indeed, Connecticut's interest in this case, if any, is probably more closely aligned with Tauck, which operates in that state.

The Court's analysis is further informed by the fact that that Wyoming's public policy in this matter is a strong one. Initially, the Act was less protective of recreation service providers, defining an "inherent risk" as "any risk that is characteristic of or intrinsic to any sport or recreational opportunity and which cannot reasonably be eliminated, altered or controlled." Wyo. Stat. Ann. § 1-1-122(a)(i) (LexisNexis 1989). In 1996, the Wyoming Legislature eliminated the clause, "and which cannot reasonably be eliminated, altered or controlled." 1996 Wyo. Sess. Laws ch. 78, § 1. Subsequent to the amendment, this Court recognized the extraordinary protection offered to recreation providers in Wyoming:

> The Court recognizes that its reading of the Wyoming Recreational Safety Act provides enormous protection to those in the business of providing recreational activities. . . . Consumers in Wyoming are now faced with an entire industry whose economic and consequent legislative power enables them to conduct business with only a passing thought to the safety of those who utilize their services. Despite this frightening prospect, the Court recognizes its place in our nation's federal system of government. A court should not decimate the purpose of a legislative act, no matter how distasteful, when that purpose is clearly incorporated in the language of the act.

*Cooperman v. David*, 23 F. Supp. 2d 1315, 1321 (D. Wyo. 1998). Given this extraordinary protection, this Court must conclude that the Wyoming Legislature views immunity for recreation providers to be an important state interest. Wyoming law should apply in this case.

The Court's decision is consistent with precedent set by the Court of Appeals for the Tenth Circuit. In *Electrical Distributers, Inc. v. SFR, Inc.*, one issue considered by the court was whether the trial court properly applied Colorado law where a covenant not to compete named Colorado as the applicable law, but was to be performed exclusively in Utah. 166 F.3d 1074, 1083-84 (10th Cir. 1999). Using the analysis that this Court has adopted above, the Court of Appeals determined that Utah's strong interest in careful scrutiny of covenants not to compete controlled over any interest Colorado had in enforcement of a contract made within its boundaries, but to be performed outside them. *Id.*

**Recreation Safety Act**

Defendants rely on Wyoming's Recreation Safety Act and claim that, pursuant to the Act, they owed no duty of care to any of the tour members. In response, Plaintiffs provide three reasons that the Act does not apply. First, they contend that Connecticut law applies—an argument that the Court has already resolved in favor of Defendants. Second, Plaintiffs argue that Tauck is not a "provider" as defined in the Act. Third, they assert that

federal law preempts the Act. The Court will now address Plaintiffs second and third arguments in turn.

Wyo. Stat. Ann. § 1-1-122(a)(ii) defines "provider" as follows: "[A]ny person or governmental entity which for profit or otherwise offers or conducts a sport or recreational opportunity." Plaintiffs claim that Tauck is not a provider because of its position that it did not conduct the activity itself, but rather was a travel agent that procured the raft trip on behalf of its tour members. In doing so, however, Plaintiffs overlook the undisputed fact that Tauck offered the float trip as part of its tour package. Given that the Act includes offering a recreational opportunity in its definition of "provider," it is obvious that Tauck is, in fact, a provider.

Plaintiffs' preemption argument requires significantly more discussion. State law may be preempted by federal law in three ways. First, Congress may expressly preempt state law. *Barnett Bank of Marion County, N.A. v. Nelson*, 517 U.S. 25, 31 (1996). Second, Congress may preempt an entire field by regulating that field so comprehensively that there is no room for state regulation. *Id.* at 31. Third, federal and state law may be in irreconcilable conflict, preempting state law even though Congress has not explicitly stated its intent to do so. *Id.* None of these three types of preemption occurred in this case.

The specific federal "law" that Plaintiffs believe preempt the Act is the concession

contract between GTLC and the National Park Service.  In particular, Plaintiffs point to the

following language in the concession contract:

> The Concessioner is responsible for providing a safe and
> healthful environment for its employees and clients as outlined
> in the Contract.  The Concessioner will develop a Risk
> Management Program that will be approved by the Service in
> accordance with the Occupational Safety and Health Act
> (OSHA) and Service Guidelines.  The Risk Management
> Program will be reviewed annually by the Service.

*Plaintiffs' Resp. to Motion For Summary Judgment on Wyoming Recreation Safety Act*, Ex.

3.  Plaintiffs claim that the concession contract "change[s] the character of the state law

provisions encompassed by" the Act, and therefore results in an actual conflict between state

and federal law.  *Plaintiffs' Resp. Motion to Dismiss on Wyoming Recreation Safety Act*, at

12.  Plaintiffs also point to the National Park Service Management Policies 2006, which

provides for visitor safety emergency response and emergency preparedness.  That document

refers several times to the safety of visitors to the park.  *Plaintiffs' Resp. Motion to Dismiss

on Wyoming Recreation Safety Act*, Ex. 4.

Plaintiffs make an argument similar to that raised by the plaintiff in *Carden v. Kelly*,

175 F. Supp. 2d 1318 (D. Wyo. 2001).  In *Carden*, this Court summarized the plaintiffs'

arguments as follows:

> 1)  Plaintiff's injuries occurred on federal land, the Bridger-
> Teton National Forest; 2)  Defendants, in order to operate their

business in the Bridger-Teton National Forest had to obtain a special-use permit from the Forest Service; 3) because Plaintiff's injuries occurred on federal land, federal law, namely Forest Service regulations and the Defendants' special-use permit apply; 4) the special-use permit contains provisions concerning negligence and injury to patrons of Forest Service permit holders, which Plaintiff claims requires the permit holders to inform their guests of the risks and have them sign a risk acknowledgment form; and 5) provisions in the Forest Service regulations requiring patrons of the Forest Service concessionaires to assume "usual" risks of activities within the National Forest conflicts with, and thus preempts, the Wyoming Recreation Statute.

*Carden*, 175 F. Supp. 2d at 1322. The Court determined that, although Congress had the authority to pre-empt the Recreation Safety Act on federal lands, it did not do so. *Id.* at 1322-26.

In the current case, the Court will follow *Carden*'s sound reasoning. The Management Policies and the concession contract cited by Plaintiffs do broadly emphasize the Park Service's interest in public safety, but does not indicate any intent to preempt Wyoming tort law. "Courts do not 'lightly attribute to Congress or to a federal agency the intent to preempt state or local laws.'" *Ramsey Winch Inc. v. Henry*, 555 F.3d 1199, 1204 (10th Cir. 2009) quoting *Nat'l Solid Wastes Mgmt. Ass'n v. Killian*, 918 F.2d 671, 676 (7th Cir. 1990).

Plaintiffs in the case at bar attempt to distinguish *Carden* by noting that the

requirements in *Carden* were imposed by the Forest Service, while this case involves the Park Service. Plaintiffs do not point out how this fact is relevant, and the Court does not discern any. The Park Service was created to

> promote and regulate the use of the Federal areas known as national parks . . . to conserve the scenery and the natural and historic objects and the wild life therein and to provide for the enjoyment of the same in such manner and by such means as will leave them unimpaired for the enjoyment of future generations.

16 U.S.C. § 1. Its mission is therefore one of conservation, and the Court does not percieve any intent to impact state tort law. The Court finds that federal law has not preempted the Wyoming Recreational Safety Act.

It is now incumbent upon the Court to determine if the Act applies to the circumstances of this case and insulates the defendants from liability. The Act states, in relevant part,

> (a) Any person who takes part in any sport or recreational opportunity assumes the inherent risks in that sport or recreational opportunity, whether those risks are known or unknown, and is legally responsible for any and all damage, injury or death to himself or other persons or property that results from the inherent risks in that sport or recreational opportunity.

> (b) A provider of any sport or recreational opportunity is not required to eliminate, alter or control the inherent risks within the particular sport or recreational opportunity.

(c)    Actions based upon negligence of the provider wherein the damage, injury or death is not the result of an inherent risk of the sport or recreational opportunity shall be preserved pursuant to W.S. 1-1-109.

Wyo. Stat. Ann. § 1-1-123.

Past disputes regarding the Act's application involve, as does this case, questions about what constitutes an "inherent risk." "'Inherent risk' with regard to any sport or recreational opportunity means those dangerous conditions which are characteristic of, intrinsic to, or an integral part of any sport or recreational opportunity." *Id.* § 1-1-122(a)(i). The Wyoming Supreme Court has had few occasions to address the determination of what is an inherent risk of a particular activity. One of the more recent cases arose as a certified question from this Court. *Jackson Hole Mount. Resort Corp. v. Rohrman*, 150 P.3d 167 (Wyo. 2006). The question certified was: "When faced with motions for summary judgment in which there are no genuine issues of material fact, how should a court differentiate, as a matter of law, between 'inherent risks' . . . and non-inherent risks . . . ?" *Id.* at 168.

> [The] general answer is that if such a motion is filed, the trial court must scrutinized the facts brought forward by the parties with great care. If the court can say that, given the evidence, this is an "inherent risk" and reasonable minds cannot differ about that, then summary judgment is appropriate. If the risk is an inherent one, then the provider has no duty to eliminate, alter, or control it. On the other hand, if reasonable minds could differ as to whether or not the risk was one inherent to the recreational activity, then summary judgment is not appropriate and the

> answer to the question must be assigned to the jury (or other fact
> finder).

*Id.* This formulation, of course, depends on properly characterizing the activity and risk. For example, in the current case, the activity may be characterized as a "scenic float trip"—as Plaintiffs do throughout their memorandum in opposition to summary judgment—or as "river rafting." The particular risk may be described generically as falling out of the boat or, more specifically, as colliding with a log jam resulting in ejection from the raft.

Governing precedent demands that the activity and risk be described as particularly as possible. In *Cooperman v. David*, for example, the Court of Appeals for the Tenth Circuit stated that, "[w]hen attempting to determine whether a risk is inherent to a sport, we can not look at the risk in a vacuum, apart from the factual setting to which the [injured person] was exposed. And, we must evaluate the risk at the greatest level of specificity permitted by the factual record." 214 F.3d 1162, 1167 (10th Cir. 2000). In this case, the activity is best described as river floating under the water conditions that were apparent when the tour members embarked. The risk is best described as the risk that the raft would encounter a log jam, ejecting one or more tour members into the river.

Applying the law from this point forward is somewhat more problematic because the precedent in this area is not entirely clear. In *Cooperman*, the court affirmed this Court's grant of summary judgment in favor of the defendant because a loose saddle cinch was an

inherent risk of the activity of horseback riding.  *Id.* at 1169.  The trial court received expert

testimony that a slipping saddle was a risk inherent to horseback riding.  *Id.* at 1168.  There

was also testimony that the particular saddle at issue was cinched too loosely, and an

inference that the loose cinching caused the saddle to slip.  *Id.*  The *Cooperman* court said

that, even with this evidence, the risk was inherent because a person cinching a saddle had

to balance between doing so too tightly and too loosely.  "This imprecision in the cinching

of the saddle is 'characteristic' or 'typical' of and therefore 'inherent in' the sport of

horseback riding."  *Id.*  Critically, the court stated,

> As part of the Coopermans' burden of showing that [the
> provider] owed Dr. Cooperman a duty of care, the Coopermans
> must provide some evidence to explain why the saddle fell,
> which explanation is not inherent to the sport. . . . Thus, stating
> only that the cinch was not tight enough does not show that the
> risk was no longer inherent to the sport.  The Coopermans have
> the burden of presenting some evidence on summary judgment
> that would raise a question of fact that the loosely cinched
> saddle was caused, not by an inherent risk, but rather by a risk
> that was atypical, uncharacteristic, not intrinsic to, and thus not
> inherent in, the recreational activity of horseback riding.  The
> Coopermans have not met this burden.

*Id.* at 1168-69.

The current case presents certain parallels.  It is undisputed based on the evidence

before the Court that being ejected or otherwise falling out of a raft is generally an inherent

risk of river floating.  For example, Sheri Griffith, an outfitter and river guide, testified that

it is an inherent risk that a person might "become a swimmer" during a float trip. Griffith Depo. 152. There is no testimony that contradicts her opinion. It is also undisputed that the rafting guide instructed the tour members that, if they were to end up in the river, the proper procedure was to float on their back until they could be recovered. L. Wilson Depo. 318; Hobbs Depo. 136. This is similar to the expert testimony in *Cooperman* that a slipping saddle is an inherent risk of horseback riding: it describes the risk in general terms without looking at the specific cause. Also like *Cooperman*, Plaintiffs in this case have not submitted admissible evidence that describes a specific cause of the injury, and shown that the particular cause falls outside of the realm of being an inherent risk. Following the *Cooperman* analysis, then, the Court would conclude that Plaintiffs have failed to demonstrate that a genuine issue of material fact exists regarding whether encountering a log jam resulting in ejection from the raft is an inherent risk of river floating.

But the Court must also consider *Sapone v. Grand Targhee, Inc.*, 308 F.3d 1096 (10th Cir. 2002). In that case, a six-year-old girl was injured when her horse bolted. *Sapone*, 308 F.3d at 1098. The plaintiffs presented evidence from an expert that "(1) the instructions were inadequate, (2) the horse was too large, (3) headgear should have been provided, (4) the trail ride may have been too dangerous, and (5) her parents were not notified of the accident." *Id.* at 1104. It is not entirely clear why these facts would affect the nature of the risk. The

court concluded "that a reasonable jury might conclude that [the girl's] injuries were the result of negligence that is not characteristic of, intrinsic to, or an integral part [of] horseback riding." *Id.* at 1105. Two possible interpretations of this passage are that negligence is never an integral part of horseback riding, or that some negligence is an integral part, but not the negligent acts complained of in that case. The former interpretation would render the statute futile as a way to safeguard recreation providers against liability, so it is unlikely that the Court of Appeals intended that meaning. The latter interpretation is more plausible, but raises the difficult question of what types of negligence are inherent to a particular activity and which are not. In either case, a trial court or fact finder is confronted with the difficult task of determining whether negligence occurred in order to determine whether the defendant owed a duty.

In any case, this Court is bound to apply *Sapone*. Plaintiffs have submitted evidence that tends to show that the river, on the day of the river float trip, was running higher and faster so as to result in an activity with some greater risk to the participants. In addition, Plaintiffs submitted evidence suggesting that this stretch of river was generally believed to be a dangerous one. Rutter Depo. Ex. 1. Specifically, a National Park Service publication entitled "Floating the Snake River" states that the area from Deadman's Bar to Moose Landing "is the most challenging stretch of river in the park and most accidents occur here.

The river drops more steeply, with faster water than in other sections south of Pacific Creek. Complex braiding obscures the main channel and strong currents can sweep boaters into side channels blocked by logjams." *Id.* This evidence is not uncontested, of course, but it is sufficient to preclude summary judgment on this issue. The Court finds that there is a genuine issue of material fact regarding whether colliding with the log jam was an inherent risk of the river float trip undertaken by the tour members on June 2, 2006.

## Negligence

Tauck moved for summary judgment in its favor on Plaintiffs' negligence claim. Tauck's argument boils down to an assertion that it is essentially a travel agency, and therefore is not liable for any negligence committed by GTLC. Plaintiffs contend that Tauck is a common carrier, and therefore subject to a heightened duty of care. They also assert that Tauck assumed a duty to warn of dangerous conditions when it distributed a form entitled "Acknowledgment of Risk" on the way to the river.

As a general rule, a tour operator is not liable for injuries caused by the negligence of third parties over which the tour operator did not exercise ownership or control. *E.g.*, *Sova v. Apple Vacations*, 984 F. Supp. 1136, 1140 (S.D. Ohio 1997).[1] The general rule may not

_____

[1]The Wyoming Supreme Court has not yet addressed this question, but it would likely follow this general rule.

apply, however, in the face of contractual language to the contrary. In this case, Plaintiffs contend that Tauck's promotional materials contained promises that Tauck would assume a certain duty. For example, they point to language in which Tauck states tour members will "enjoy VIP attention from our experienced Tauck Directors who are dedicated to making your trip the best it can be" and that "[o]nce you arrive at your Tauck Bridges destination, leave the day-to-day details to us—all you need to do is have fun with your family." *Plaintiffs' Resp. to Motion for Summary Judgment on Negligence*, 5-6. They compare this language to that relied upon by the court in *Stevenson v. Four Winds Travel, Inc.* to find that the plaintiff had a right to expect a warning of a slippery condition while on a tour. 462 F.2d 899, 906-07 (5th Cir. 1972).

Stevenson, however, is distinguishable from the current case. First, the language in the promotional materials in *Stevenson* is considerably stronger than those distributed by Tauck. For example, the materials stated that guests would be "cared for by a carefully selected Four Winds Tour escort" and that the tour directors "know precisely what you will be seeing and doing every day." *Id.* In contrast, Tauck's materials state that trips "are enhanced by our experienced directors," and that Tauck will "take care of all [arrangements] for you, so you can indulge in the joys of travel without any of the day-to-day hassles." *Plaintiffs' Resp. to Motion for Summary Judgment on Negligence*, 5. To the extent that these

vague statements mean anything at all, it falls far short of a promise to assume a duty. In addition, there is no indication in *Stevenson* that there was a separate contract. In this case, however, Tauck's "Conditions of Tour"—relied upon by Plaintiffs in its argument that Connecticut law is applicable—contains a provision in which Tauck disclaims liability for "any Damages, or any problems concerning any . . . supplier providing tour services [or] programs, . . . including but not limited to . . . negligence by any . . . other supplier providing tour services [or] programs." *Plaintiffs' Resp. to Motion for Summary Judgment on Recreation Safety Act*, Ex. 1. Courts have relied on similar disclaimers to bar liability for acts of third parties that are beyond the control of the tour operator because the disclaimers are evidence that the operator did not intend to assume a guarantee of safety, even if the disclaimer is not itself contractually binding. *E.g.*, *Sova*, 984 F. Supp. at 1139-40 (collecting illustrative cases). Accordingly, this Court finds that, as a matter of law, Tauck had no duty, either by virtue of its position as a tour operator or assumed through its promotional materials.

Plaintiffs next contend that Tauck is a common carrier pursuant to the common law and Article 10, Section 7 of the Wyoming Constitution. That provision states: "All corporations engaged in the transportation of persons, property, mineral oils, and minerals products, news or intelligence, including railroads, telegraphs, express companies, pipe lines

and telephones, are declared to be common carriers." Plaintiffs then rely upon section 314A of the Restatement (Second) of Torts, which states that a common carrier has a duty to its passengers to take reasonable action "to protect them against unreasonable risk of physical harm," and to render aid if they are harmed. Tauck contends that it is not a common carrier because it does not actually transport tour members during the river floating trip.

Tauck's position has merit, and there is authority for the proposition that a tour operator is not a common carrier. *E.g.*, *Stafford v. Intrav, Inc.*, 841 F. Supp. 284, 287 (E.D. Mo. 1993). The Court need not resolve the question of whether Tauck is a common carrier, however, because even if it is in general, it was not transporting tour members at the time of the raft collision. The undisputed evidence is that the tour members, during the rafting trip, were being transported by GTLC, not Tauck. In short, the tour members were no longer subject to Tauck's custody or control, and therefore Tauck owed no duty. See *Id.* (tour operator had no duty to warn of dangerous condition on premises not under its control).

This leaves the question of whether distribution of "Acknowledgment of Risk" forms resulted in an imposition of a duty on Tauck. Plaintiffs cite section 324A of the Restatement (Second) of Torts, which states:

> One who undertakes, gratuitously or for consideration, to render services to another which he should recognize as necessary for the protection of a third person or his things is subject to liability to the third person for physical harm resulting from his failure

to exercise reasonable care to protect his undertaking, if

    (a)    his failure to exercise reasonable care increases the risk of such harm, or

    (b)    he has undertaken to perform a duty owed by the other to the third person, or

    (c)    the harm is suffered because of reliance of the other or the third person upon the undertaking.

The Wyoming Supreme Court adopted this provision as reflected in subsection (a) in *Ellsworth Bros., Inc. v. Crook*, 406 P.2d 520, 524 (Wyo. 1965). Relying on the Restatement, Plaintiffs claim that "by requiring its Tour Directors to get guests to sign GTLC's *Acknowledgment of Risk* form well in advance of arriving at the Lodge, Tauck undertook the duty to inform guests about risks associated with the raft trip." *Plaintiffs' Resp. to Motion for Summary Judgment on Negligence*, 7.

This statement, however, assumes that by undertaking to distribute the "Acknowledgment of Risk" form, Tauck was undertaking the broader task of informing guests about risks associated with the raft trip. There is no evidence before the Court to support this assumption. The only evidence that Tauck undertook to do anything for GTLC is testimony that GTLC asked Tauck to present the form to those tour members who were

to participate in the rafting trip. Rice Depo. 47.[2] There is no testimony that suggests Tauck was asked, or agreed, to inform guests of all risks involved in the rafting trip.

The Court finds as a matter of law that Tauck did not owe a duty to the tour members to warn them of the conditions of the river or otherwise act to prevent their injuries. Tauck may not be found negligent on a theory of direct liability.

## Joint Venture

The Court must next address Tauck's contention that it may not be held vicariously liable for GTLC's negligence because the two companies did not form a joint venture. Tauck argues that GTLC was simply a supplier, and that the two businesses did not jointly embark on a business venture. In Wyoming, a person alleging the existence of a joint venture has the burden to prove four elements:

> (1) an agreement, express or implied, among the members of the group; (2) a common purpose to be carried out by the group; (3) a community of pecuniary interest in that purpose, among the members; and (4) an equal right to a voice in the direction of the enterprise, which gives an equal right of control.

*Popejoy v. Steinle*, 820 P.2d 545, 549 (Wyo. 1991) quoting *Holliday v. Bannister*, 741 P.2d 89, 93 n.1 (Wyo. 1987).

---

[2]There is some conflict in the record regarding precisely when the tour members were given the form, but that is not material for resolution of this issue.

Considering the first element, that of an agreement, the Court finds that there is a genuine issue of material fact regarding whether Tauck and GTLC agreed to provide services. Plaintiffs have submitted a document entitled "Tour Operator Contract," which governs the terms of the sale of room blocks and river float trips to Tauck. *Plaintiff's Resp. to Motion for Summary Judgment on Joint Venture*, Ex. 5. Several witnesses, officials of Tauck, testified that they viewed GTLC as a supplier, not as a partner. Nevertheless, viewing the contract in the light most favorable to Plaintiffs, it is not unreasonable to characterize it as an agreement for the purposes of this joint venture analysis.

The Court also finds that a reasonable jury could find that Tauck and GTLC had a common purpose. This purpose was to sell tour members lodging and river float trips. Tauck's purpose was somewhat broader, generally, because it sold lager tours of which the interaction with GTLC was a small part, but this does not remove the fact that GTLC and Tauck were united in purpose during this portion of the tour. Similarly, they both had a pecuniary interest in the enterprise. Tauck points out that GTLC received the same amount for its float tours whether its guests were members of a Tauck tour or individuals. But the arrangement nonetheless furthered GTLC's financial goals by bringing significant numbers of guests to GTLC. Similarly, Tauck benefitted financially by featuring GTLC lodging and the float trip as part of its tour.

The Court does not find, however, that Tauck and GTLC had an equal right of control. Plaintiffs rely heavily on the fact that both business had the capability to cancel the float trip at their discretion, but that does not suggest an equal voice in the activity in question. For example, the evidence submitted to the Court indicates that the Tauck tour director brought the residents to the lodge and interacted with GTLC staff, but there is no indication that any Tauck official had the authority to direct any day-to-day activities. It had no input into the decision to hire Mr. Hobbs, the guide of Raft No. 2, or to direct the manner in which he conducted the rafting trip. Tauck could not have directed that the river guide take the group down a different part of the river, or terminated the guide's employment. If GTLC had decided to terminate its river floating operations, Tauck would have been powerless to prevent it, aside from the scope of any service contract that was currently in place. Tauck and GTLC were two separate operations, and there is no evidence submitted to the Court that suggests otherwise. The Court finds, as a matter of law, that Tauck and GTLC did not have a joint venture.

The Court notes that, with no direct liability and no joint venture resulting in vicarious liability, Tauck is not liable for any claims of negligence.

**Fraud**

Plaintiffs have alleged that GTLC and Tauck committed fraud by enacting a scheme

whereby the tour members were lured into taking a dangerous rafting trip as a result of GTLC and Tauck's material misrepresentations regarding the level of danger. "To prove fraud, the plaintiff must show by clear and convincing evidence that (1) the defendant made a false representation intended to induce action by the plaintiff; (2) the plaintiff reasonably believed the representation to be true; and (3) the plaintiff suffered damages in relying upon the false representation." *Garrison v. CC Builders*, Inc., 179 P.3d 867, 877 (Wyo. 2008). The false representation must be made knowingly: "One cannot be guilty of fraudulently or intentionally concealing or misrepresenting facts of which he is not aware." *Meeker v. Lanham*, 604 P.2d 556, 559 (Wyo. 1979). Plaintiffs' fraud claim fails because they have failed to provide evidence from which a reasonable jury could find by clear and convincing evidence that Defendants knowingly made a false representation of a material fact.

Plaintiffs first cite statements made in Tauck's travel brochure discussing the rafting trip. "[T]he record shows that Tauck's 2006 Brochure described the Snake River as a 'meandering float trip,' when in actuality, the Plaintiffs' [sic] ended up on a whitewater raft trip with Class IV rapids." *Plaintiffs' Resp. to Motion for Summary Judgment on Fraud Claim*, 8. Plaintiffs also cite statements in Tauck's promotional materials stating that its tour directors are "knowledgeable professionals, with a wealth of information," and that Tauck "does it all for you," and that tour members can "leave all day-to-day details" to Tauck. *Id.*

For the most part, these promotional statements are "mere puffery" *E.g.*, *Alpine Bank v. Hubbell*, 555 F.3d 1097, 1106 (10th Cir. 2009). The one arguable exception is the description of the activity as a "meandering float trip," which may be sufficiently definite that a sensible person may be justified in relying on it to some degree. Even in that case, however, there is no indication that Tauck was aware that the river floating trip would be anything other than as described.

The key problem with Plaintiffs' case is that there is no indication that this particular stretch of the Snake River was inherently dangerous on the day of the collision. Instead, the evidence, viewed in a light most favorable to Plaintiffs, indicates that the guide of the raft that collided with the log jam took the raft into an unsafe channel. For example, the deposition of Wayne Johnson, one of the river guides on June 2, 2006, indicates that he viewed the "Funnelcake" channel as dangerous on that date. Johnson Depo. 184. Mr. Reed Finlay, a river guide with a different company, testified at some length about the "Funnelcake" channel, specifically that it was dangerous on the date of the collision. Finlay Depo. 126-32. Indeed, it is undisputed that the float trip on the day of the collision was peaceful and uneventful until Raft No. 2 entered the channel and struck the log jam. J. Wilson Depo. 76-77; R. Rizas Depo. 102, 209, 219. In short, there is no indication that Tauck made a misrepresentation when the rafting trip was marketed as a "meandering float

trip."

Plaintiffs also rely on several statements made by employees of Tauck and GTLC before the raft trip. First, Mr. Wilson saw saw people white water rafting while on the bus trip into Jackson on June 1, 2006. When the he asked the tour director, Mr. Rice, if that was what their rafting trip would be like, Mr. Rice replied that the rafting trip would be a "leisurely, scenic float down the Snake River," and not to worry. Mr. Rice also stated that Tauck had "never lost anybody." L. Wilson Depo. 61-62. Second, while the groups were in the GTLC vans on the way to the river, Ms. Elizabeth Rizas asked the van driver about the safety of the float trip. The van driver responded by telling her that she was more likely to be in an accident in the van traveling to the river than on the float trip. J. Wilson Depo 39-40. There is also some evidence that the van driver also stated that they had "never lost anybody yet." *Id.* 60.

Again, there is no evidence indicating that these statements are deliberately false. Much like Tauck's advertising, there was no reason for Tauck or GTLC to believe that the rafting trip would be anything other than a leisurely, scenic float trip. Although Plaintiffs repeatedly rely on the fact that the river was flowing stronger and faster than usual because of the spring thaw, there is no evidence suggesting that this change in conditions precluded GTLC from being able to provide the safe and relaxing experience that the tour members

were expecting. The additional fact that the float trip resulted in a devastating collision instead is not relevant when considering what Tauck and GTLC knew at the time they made the statements at issue.

Lastly, Plaintiffs contend that Defendants committed fraud by failing to inform them of the full nature of the risks on this particular float trips. The Court finds that any failure to inform the guest of these dangers is not actionable as a matter of law. First, there can be no fraud because there is no statement involved. The Court also relies on the Wyoming Supreme Court's explicit refusal to adopt the tort of nondisclosure in *Pittard v. Great Lakes Aviation*, 156 P.3d 964, 976 (Wyo. 2007). Plaintiffs have failed to establish the existence of a genuine issue of material fact that would preclude summary judgment in Defendants' favor on the fraud issue.

## Punitive Damages

GTLC has moved to dismiss Plaintiffs' claim for punitive damages.[3] Plaintiffs' response is similar to their fraud argument, that is, that GTLC deliberately misrepresented the float trip as safe and leisurely.

---

[3]Tauck has also moved for summary judgment in its favor on the punitive damages issue. The Court, however, has already determined that Tauck is not liable, either directly or vicariously. Accordingly, the Court's discussion addresses only Plaintiffs' claim as it applies to GTLC.

The Wyoming Supreme Court has set out the following standard regarding punitive damages:

> We have explained that punitive damages "are to be awarded only for conduct involving some element of outrage, similar to that usually found in crime. . . . We have approved punitive damages in circumstances involving outrageous conduct, such as intentional torts, torts involving malice and torts involving willful and wanton misconduct." *Weaver v. Mitchell*, 715 P.2d 1361, 1369-70 (Wyo. 1986). Willful and wanton misconduct is the intentional doing, or failing to do, an act in reckless disregard of the consequences and under circumstances and conditions that a reasonable person would know that such conduct would, in a high degree of probability, result in harm to another. *Mayflower Rest. Co. v. Griego*, 741 P.2d 1106, 1115 (Wyo. 1987). "The aggravating factor which distinguishes willful misconduct from ordinary negligence is the actor's state of mind. In order to prove that an actor has engaged in willful misconduct, one must demonstrate that he acted with a state of mind that approaches intent to do harm." *Bryant v. Hornbuckle*, 728 P.2d 1132, 1136 (Wyo. 1986) (internal citation omitted).

*Cramer v. Powder R. Coal Co.*, 204 P.3d 974, 979-80 (Wyo. 2009).

Plaintiffs reason as follows:

> Defendants here should have communicated the true Snake River conditions to the Plaintiffs rather than misrepresent the conditions and intentionally take the guests who had signed up for a scenic float trip into something knowingly quite different. Defendant's failure to communicate the details indicates "reckless disregard of the consequences, and under such circumstances and conditions that a reasonable man would know, or have reason to know, that such conduct would, in a high degree of probability, result in substantial harm to another."

*Danculovich* [*v. Brown*], 593 P.2d [187,] 191.

*Plaintiffs' Response to Motion for Summary Judgment on Punitive Damages*, 11.

Plaintiffs' contention that GTLC was aware that the float trip was materially more dangerous than previously represented to the tour members is not, as the Court has discussed, reflected in the record. Although it is undisputed that the level and flow of water was increased, and that this increase may heighten the risk of log jams or hide obstructions in the river, there is no evidence suggesting that the character of the river was altered to such an extent that it was willfully reckless to take passengers on the float trip.

The facts of this case are in stark contrast to those cases relied on by the Plaintiffs in which the Wyoming Supreme Court overturned trial courts' grants of summary judgment in defendants' favor on punitive damages. For example, the conduct alleged in *Danculovich* was drunk driving and speeding resulting in the driver losing control of the vehicle and killing the decedent. 593 P.2d at 190. The evidence in that case indicated that the defendant, who was driving the vehicle, had a blood alcohol content of 0.12%. *Id.* The court described the evidence of speeding as follows:

> Radar clock of vehicle at 56 m.p.h. was made at north edge of business district. A witness estimated speed at 75 m.p.h. at city limits. Another witness estimated speed at 85 m.p.h. when vehicle passed him at point about .4 of mile before place of

> accident. Accident reconstruction expert estimated speed at place of accident to be minimum of 75 m.p.h. The speed limit within the city limits was 30 m.p.h. and beyond the city limits, 55 m.p.h.

*Id.* n.3. In *Errington v. Zolessi*, a treating physician conducted several cystograms of a patient following a laparoscopically assisted vaginal hysterectomy. 9 P.3d 966, 968 (Wyo. 2000). The cystograms initially indicated the presence of a fistula, and later confirmed it, but the doctor told the patient that she was healing normally, albeit slowly. *Id.* The Wyoming Supreme Court held that there was sufficient evidence that would allow a reasonable jury to find that the physician acted with reckless disregard for the patient's safety. In either case, it is apparent that simply failing to advise the tour group members of the increased flow of the river does not rise to the level of reckless and willful misconduct. There is no question that the consequences of any negligence committed were devastating. But this Court must evaluate the question of outrageous conduct based on what was known at the time of the allegedly negligent act, not looking back at events with the benefit of hindsight. This is not to say that this conduct may not constitute simple negligence, but it does not warrant punitive damages.

IT IS ORDERED that *Tauck's Motion for Summary Judgment on Wyoming Recreational Safety Act*, Docket No. 87, is DENIED.

IT IS FURTHER ORDERED that *Tauck's Motion for Summary Judgment on*

*Plaintiffs' Claim of Negligence*, Docket No. 81, is GRANTED.

IT IS FURTHER ORDERED that *Tauck's Motion for Summary Judgment on Plaintiffs' Claims of Joint Venture*, Docket No. 84, is GRANTED.

IT IS FURTHER ORDERED that *Tauck's Motion for Summary Judgment on Plaintiffs' Claims of Fraud*, Docket No. 90, is GRANTED.

IT IS FURTHER ORDERED that *Tauck's Motion for Summary Judgment on Plaintiffs' Claim for Punitive and Exemplary Damages*, Docket No. 93, is GRANTED.

IT IS FURTHER ORDERED that Grant Teton Lodge Company's Motion for Summary Judgment on Plaintiffs' Claims, Docket No. 96, is granted in part and denied in part. Specifically, the motion is DENIED as it relates to application of the Wyoming Recreation Safety Act, and is in all other respects GRANTED.

Dated this _____ day of October, 2009.

_____
ALAN B. JOHNSON
UNITED STATES DISTRICT JUDGE